IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GREGORY L. JENKINS
Individually and as administrator of
the estate of Hoyt D. Jenkins,
deceased, et al.,

    Plaintiffs,

     v.

DEKALB COUNTY, GEORGIA,  et
al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:06-CV-1584-TWT

ORDER

This is a 42 U.S.C. § 1983 action that arises out of the death of a DeKalb

County Jail inmate.  It is before the Court on the Plaintiffs' Motion to Compel [Doc.

83].

I. BACKGROUND

Hoyt Jenkins was a 71 year old inmate locked up in the DeKalb County Jail.

He was found dead in his jail cell on July 7, 2004.  Jenkins had a history of mental

illness, and according to the Plaintiffs, his illness manifested itself in the form of

physical violence and verbal outbursts.  These outbursts often included racial epithets.

The Plaintiffs argue that Jenkins's mental illness was brought to the attention of

DeKalb County as early as December 2003.  At that time, Superior Court Judge Robert Castellani ordered a psychiatric evaluation to determine whether Jenkins was competent to stand trial.  The psychiatrists found Jenkins to be delusional and actively psychotic.

On March 3, 2004, Judge Castellani ordered the DeKalb Sheriff's Office to transfer Jenkins to the Georgia Regional Hospital in Atlanta.  The Plaintiffs note that this transfer was ordered because "the DeKalb County Jail was not equipped to furnish Jenkins with the psychiatric care that he required."  (Compl., at ¶ 14.)  Rather than comply with the court order, the Sheriff's Department kept Jenkins in the DeKalb County Jail for the next three months.  In addition, Jenkins was housed in the general jail population rather than in the psychiatric ward.

The Plaintiffs argue that jail officials deliberately placed Jenkins, an elderly man who weighed one hundred and forty-four pounds, in a locked cell with a large and violent inmate in retaliation for Jenkins's repeated racial outbursts.  Specifically, they allege that on July 6, 2004, jail officials changed Jenkins's cell assignment from cell 605 to 604.  Cell 604 housed Jason Smith, a black inmate in the DeKalb County Jail who was arrested on drug possession charges.  Smith was 24 years old, stood six-feet tall, and weighed one hundred and eighty pounds. (Compl., at ¶ 30.)  The circumstances of Smith's arrest are somewhat strange.  He produced a bag of marijuana

to police officers, and demanded that they arrest him for fear that his life was in danger.  When he was taken to the jail on July 6, 2004, Smith tried to escape and had to be subdued after violent altercations with several officers.

Early on July 7, 2004, DeKalb County jailers found Jenkins dead in cell 604. The evidence suggests that Jenkins was beaten to death.  He was found lying on his back, with his hands held near his face. Jenkins suffered twelve broken ribs, and his eyes were swollen shut.  (Compl., at ¶ 28-29.)  The Plaintiffs contend that Smith savagely beat Jenkins to death by repeatedly jumping from the top bunk onto Jenkins's body.  (Compl., at ¶ 31.)

The Plaintiffs filed this lawsuit on July 3, 2006, against DeKalb County, Sheriff Thomas E. Brown in his individual and official capacities, and three employees of the DeKalb County Sheriff's Department.  The Plaintiffs have alleged violations of the Eighth and Fourteenth Amendments, and have brought suit under 42 U.S.C. § 1983. The Plaintiffs further invoke the supplemental jurisdiction of this Court for related state law claims.  The Plaintiffs allege that Defendants are responsible for Jenkins's death; that jail officials intentionally switched Jenkins's cell assignment in order to teach him a lesson; that the officers acted with a deliberate indifference for Jenkins's well being; and that jail employees were improperly trained and acting pursuant to flawed jail policies.

This discovery dispute arises out of the Plaintiffs' deposition of William Brickhouse, Ph.D., the Mental Health Director for the DeKalb County Jail. Dr. Brickhouse is employed by MHM Correctional Services, Inc. as the director of mental health for the DeKalb County Jail. (Dr. Brickhouse's Resp. to Pls.' Mot. to Compel, at 3.) During the deposition, Dr. Brickhouse revealed that he participated in a post-death investigation and prepared a "Mortality and Morbidity report" relating to Jenkins's death. (Mem. in Supp. of Pls.' Mot. to Compel, Ex. A, at 47-56.) Dr. Brickhouse maintains that such a post-death investigation is required by written jail policy. (Dr. Brickhouse's Resp. to Pls.' Mot. to Compel, at 4.) The Defendants refused to produce or identify this document in their Mandatory Disclosures or Responses to Plaintiffs' discovery requests.

During the course of his deposition, Dr. Brickhouse disclosed the fact of the post-death investigation and the existence of the report. But Dr. Brickhouse's counsel refused to allow him to answer questions about the contents of the report. She asserted that Brickhouse's investigation constituted undiscoverable "peer review" under Georgia law. The Plaintiffs responded by serving Dr. Brickhouse with a Rule 45 subpoena/request for documents asking for:

1.

A copy of the Morbidity and Mortality Report generated by Dr. William Brickhouse and other individuals following the death of Hoyt Jenkins in July, 2004.

2.

Any and all memos, documents, correspondence, memoranda, e-mail communications, and other writings utilized in connection with the generation of the Morbidity and Mortality Report identified in number one above.

(Mem. in Supp. of Pls.' Mot. to Compel, Ex. B.)  Dr. Brickhouse responded by noting that he "object[ed] to providing this document based upon O.C.G.A. § 31-7-140 *et seq.*, commonly referred to as Georgia's medical review privilege."  (Mem. in Supp. of Pls.' Mot. to Compel, Ex. C.)

This matter is before this Court pursuant to Federal Rule of Civil Procedure 37(a)(2)(B).  The Plaintiffs want this Court to order Dr. Brickhouse to (1) answer questions that he refused to answer during his November 6, 2006, deposition, and (2) to produce documents he refused to produce in response to the subpoena.

## II.  STANDARD

The Federal Rules of Civil Procedure authorizes parties to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . ."  Fed. R. Civ. P. 26(b)(1).  Federal Rule of Evidence 501 provides that "[t]he privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and

experience."  Fed. R. Evid. 501.  "[T]he federal law of privilege provides the rule of decision in a civil proceeding where the court's jurisdiction is premised upon a federal question, even if the witness-testimony is relevant to a pendent state law count which may be controlled by a contrary state law of privilege."  Hancock v. Hobbs, 967 F.2d 462, 467 (11th Cir. 1992).  Thus, even in a case such as this, where the Plaintiffs are alleging violations of state law in addition to violations of federal law, federal courts look to federal law to determine the applicable privileges.  This rule is driven by a respect for the precedents of other circuits, as well as the pragmatic concern that "it would be impractical to apply two different rules of privilege to the same evidence ..." Id.

## III.  DISCUSSION

It is undisputed that Dr. Brickhouse's report is "relevant" to the Plaintiffs' claim. The issue is whether, under federal common law, the report is privileged.  Dr. Brickhouse asserts that "peer review" and "medical review" privileges apply in this case.   First, he cites Georgia's peer review statute which states that the "proceedings and records of a review organization shall be held in confidence and shall not be subject to discovery . . . in any civil action; and no person who was in attendance at a meeting of such organization shall be permitted or required to testify in any such civil action."  O.C.G.A. § 31-7-133(a).  Second, he cites Georgia's medical peer review

statute, which protects the "proceedings and records of medical review committees." O.C.G.A. § 31-7-143.

State law does not supply the rule of decision in this case. See In re International Horizons, Inc., 689 F.2d 996, 1003 n.15 (11th Cir. 1982) (quoting approvingly of H.R. Rep. No. 1597, 93d Cong., 2d Sess. (1974)). If this Court applies state privilege law, it is only because "reason and experience" dictate such an application. Georgia's statutes in this context, therefore, are at best persuasive, and lack the force of a binding law. Dr. Brickhouse faces an uphill battle in his effort to extend the Georgia peer review privilege to federal court.

The Supreme Court has never recognized a federal medical peer review privilege and there are no circuit court cases recognizing such a privilege. Federal Rule of Evidence 501, however, empowers this Court to recognize such a privilege based on the "principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Fed. R. Evid. 501. Thus, the absence of controlling precedent is not immediately and necessarily fatal to Dr. Brickhouse's assertion of privilege. Jaffee v. Redmond, 518 U.S. 1, 8 (1996) ("Rule [501]did not freeze the law governing the privilege of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.") (quoting Trammel v. United States, 445 U.S.

40, 47 (1980)).  But neither is the absence of precedent particularly helpful to his claim as there is a presumption against the creation of new privileges.  See United States v. Nixon, 418 U.S. 683 (1974) ("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.").  Just because this Court can find the existence of a new privilege does not mean that it should.

There is some ambiguity over what standard this Court should apply when determining whether to recognize a new privilege under Rule 501.  The Eleventh Circuit has held that "the rule in this Circuit is that a new privilege should only be recognized where there is a 'compelling justification.'"  In re International Horizons, Inc., 689 F.2d 996, 1004 (11th Cir. 1982) (citing In re Dinnan, 661 F.2d 426, 430 (5th Cir. 1981)). The Eleventh Circuit did not identify what it is that makes a justification "compelling" in this context.  It merely noted that there is a presumption against the creation of new privileges, and noted the federal judiciary's hostility to the creation of artificial constraints upon the search for truth.  Id.

In ACLU v. Finch, 638 F.2d 1336, 1345 (5th Cir., Unit A, March 13, 1981), decided a year before International Horizons, the court held that where "a litigant seeks to assert a privilege not existent in the common law but enacted by the (state) legislature based on the unique considerations of government policy . . . courts [must]

balanc[e] the policies behind the privilege against the policies favoring disclosure." Id. The court divided the balancing into two parts. First, a court must determine whether the state's justification for the privilege is adequate grounds for respecting the privilege, regardless of the federal court's independent judgment of its intrinsic desirability. Id. at 1343. Second, a court must determine whether the privilege is meritorious in the court's independent judgment. Id.

The application of part one of the balancing test is straightforward. It requires courts to look to principles of comity and federalism in order to determine whether the state privilege ought to apply. In re International Horizons, Inc., 689 F.2d at 1004 ("There is . . . authority for the proposition that federal courts should recognize state evidentiary privileges where this can be done at no substantial cost to federal policies."). Such comity is rooted in principles of federalism and respect for the sovereignty and public policy interests of the state in which a federal court sits. See Younger v. Harris, 401 U.S. 37, 43 (1971) (Black, J.) (noting that comity forwards principles of federalism "in which there is sensitivity to the legitimate interests of both State and National Governments"); United States v. King, 73 F.R.D. 103, 105 (E.D.N.Y. 1976) ("A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy."). Nonetheless,

comity need not carry the day where advancing the state interests would "substantially thwart an important federal interest."  In re International Horizons, Inc., 689 F.2d at 1004.

The ambiguity lies in the second part of the Fifth Circuit's test.  That is, what standard should a federal court use when assessing the merits of a new privilege?  In Finch, the Fifth Circuit identified "Wigmore's classic utilitarian formulation of the conditions for recognition of a testimonial privilege" as the applicable standard:

(1)   The communications must originate in a confidence that they will not be disclosed.
(2)   This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.
(3)   The relation must be one which in the opinion of the community ought to be sedulously fostered.
(4)   The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit gained for the correct disposal of the litigation.

Finch, 638 F.2d at 1344.  The court described the weighing of these factors as a matter for the discretion of the district court, and explained that "[a]s a general rule, we defer to the discretion of the trial judge in applying this test."  Id.

Although the nominal rule of the Eleventh Circuit is that there must be a "compelling justification" for a new privilege, the Supreme Court's more recent treatment of the issue in Jaffee v. Redmond, 518 U.S. 1 (1996) must be considered.  In Jaffee, the Supreme Court confronted the issue of whether federal courts should

honor a psychotherapist-patient privilege.  After identifying a series of principles of restraint, such as the presumption against the creation of new privileges, and the fact that privileges interfere with the search for truth, Justice Stevens described the question before the Court as "whether a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence.'" Id. at 9-10 (quoting Trammel, 445 U.S. at 51).  Based upon "reason and experience" the Court concluded that the privilege protected sufficiently important interests to outweigh the need for probative evidence. Id.  The Court based its recognition of the privilege on four factors: (1) determining whether the privilege is rooted in the imperative need for trust and confidence; (2) whether the privilege promotes broader public interests; (3) assessing how much evidence would be lost or gained by recognizing the privilege; and (4) looking to the laws of the 50 states as evidence of whether "reason and experience" support recognition of the privilege.[1]

The Supreme Court's analysis closely mirrors the Wigmore factors adopted by Judge Wisdom in Finch.  Mindful of the Supreme Court's place in the federal judicial

---

[1]The Court also identified the fact that the psychotherapist-patient privilege was among the nine specific privileges recommended by the Advisory Committee in its proposed privilege rules.  The Court was careful to describe this fact as an example of how "the uniform judgment of the States is reinforced." Jaffee, 518 U.S. at 14.

hierarchy, this Court will address the question before it as follows: First, does comity compel recognition of the Georgia's medical peer review privilege? Second, does a privilege protecting communications and documents generated by medical peer review committees promote sufficiently important interests to outweigh the need for probative evidence?

Before addressing these two narrow questions, the Court will quickly dispense with the cases cited by Dr. Brickhouse's attorney for the proposition that precedent compels an application of the privilege.  First, counsel cites <u>Somer v. Johnson</u>, 704 F.2d 1473 (11th Cir. 1983).  This was a diversity action for medical malpractice.  <u>Id.</u> at 1475.  The issue before the Eleventh Circuit was whether a Florida peer review law created a "substantive privilege" or a "state discovery device." <u>Id.</u> at 1479.  There was never a question of whether Florida's law of privileges would apply.  The only question was whether the law before the court was indeed a law of privilege.  Neither party before the Court has attempted to characterize the Georgia statutes as mere discovery devices.  Thus, the case sheds no light on whether federal courts should recognize a federal medical peer review privilege.

The next case offered in support of the existence of this privilege is the unreported decision of <u>Campbell v. Emory Clinic</u>, 1992 WL 754019 (N.D. Ga. Aug. 6, 1992).  The Plaintiffs are correct that the case did involve federal and state claims,

and that the district court applied the Georgia state medical review statute. Nonetheless, it now provides no support for a federal medical review privilege. First, the decision, handed down on August 6, 1992, was decided a mere two weeks after the Eleventh Circuit entered its decision in Hancock v. Hobbs, 967 F.2d 462, 467 (11th Cir. 1992). As outlined above, Hancock adopted the rule that where federal jurisdiction is predicated upon a federal question, federal law will govern the law of privileges even where there are pendent state law claims. The district court in Campbell did not address the issue of whether state or federal law should govern the application of privileges. It applied state law with no discussion of the standard. The court's decision to do so is understandable. The vast majority of claims brought by the plaintiff in Campbell involved state law claims. The case is not persuasive authority for Dr. Brickhouse's position.

Does comity compel recognition of the Georgia's medical peer review privilege? Dr. Brickhouse does not explicitly argue that this Court should recognize Georgia's peer review privilege as a matter of comity. Rather, his attorneys contend that recognition of Georgia's privilege is compelled by a "balancing test" under Federal Rule of Evidence 501. As noted above, Georgia's law of privileges is not binding. Thus, the Court will treat Dr. Brickhouse's claims for this Court to honor Georgia law as a plea for the Court to recognize the privilege as a matter of comity.

In other words, is the fact that Georgia courts recognize the privilege enough of a reason to honor the privilege, regardless of what this Court thinks its merits? <u>ACLU v. Finch</u>, 638 F.2d 1336, 1343 (5th Cir.1981).

Applying state law strictly as matter of comity is inappropriate in a case such as this.  Even if the report, as well as Dr. Brickhouse's testimony regarding the report, is privileged as a matter of Georgia law,[2] applying Georgia's statutes without regard to a federal court's independent assessment would substantially undermine an important federal interest.  This case is before the Court on a section 1983 claim.  Barely six years after the end of the Civil War, Congress passed what is now codified as 42 U.S.C. § 1983.  <u>See</u> <u>Monroe v. Pape</u>, 365 U.S. 167, 171 (1961) (discussing the legislative history of section 1 of the Ku Klux Klan Act).  It "was enacted for the express purpose of enforc(ing) the Provisions of the Fourteenth Amendment." <u>Mitchum v. Foster</u>, 407 U.S. 225, 238 (1972).  Congress, speaking through the language of section 1983, and armed with the powers of the Fourteenth Amendment, set aside concerns for state sovereignty, and authorized federal courts to vindicate state deprivations of liberty.  42 U.S.C. § 1983 ("Every person who, under color of any . .

---

[2]The Court finds no reason to interpret state law where unnecessary, and assumes, for the sake of argument, that the report would be excluded under state law. This is not to suggest, however, that there might not be a host of arguments for why the report falls outside of the scope of either state statute.

. custom . . . of any State . . . causes to be subjected, any citizen . . . to the deprivation of any rights . . . shall be liable to the party injured . . .”); Mitchum, 407 U.S. at 238 (“[Its passage was] an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.”).  Thus, when Congress acts pursuant to section 5 of the Fourteenth Amendment, concerns for state sovereignty are at their lowest ebb.  See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976) (“When Congress acts pursuant to s 5 . . . it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority.”); see also Kerr v. United States Dist. Ct. for the No. Dist. of Ca., 511 F.2d 192, 197 (9th Cir. 1975) (“The state’s interest is that of a litigant, and not, as in diversity cases, that of a sovereign whose law is being applied in a foreign forum.”).  Section 1983's status as a legislative effort to enforce the Fourteenth Amendment provides an objective basis for finding that an “important federal interest” is at stake; namely, the interest in providing litigants with an independent federal forum to address the deprivation of their liberties.[3] See Finch, 638 F.2d at 1343-44 (finding the “federal interest in an independent

---

[3]Although there may be a level of arbitrariness involved when assessing how “important” the federal interest is, rooting the “importance” of the federal interest in the structural history of section 1983 provides a clear benchmark for determining just how “important” the federal interest is when compared to state autonomy.

evaluation of the claimed privilege is particularly strong" in a section 1983 action). The independence of the federal forum would be compromised were this Court to authorize states to legislatively insulate their political subdivisions from the rigors of the discovery process without an opportunity for federal assessment of the interests at stake.  Finch, 638 F.2d at 1343-44 (5th Cir. 1981) ("The purpose of enacting section 1983 was to ensure an independent federal forum for adjudication of alleged constitutional violations by state officials; and . . . there is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is privileged.").  Thus, Dr. Brickhouse's assertion of medical peer review privilege on the basis of Georgia's statute should be denied.

Drawing upon both "reason and experience," the Court's task is to determine whether creating a federal medical peer review privilege would protect sufficiently important interests to outweigh the need for probative evidence.  Because the Plaintiffs are undoubtedly correct to point out that there is no Eleventh Circuit or Supreme Court precedent recognizing a federal medical peer review privilege, the Court begins by surveying the common law of other circuits to verify that there is no privilege against the disclosure of medical peer review information.

It appears that every United States Court of Appeals that has addressed the issue of whether there is a federal medical peer review privilege has rejected the claim.  See

Agster v. Maricopa Cnty., 422 F.3d 836, 840 (9th Cir. 2005) (rejecting peer review privilege for protection of a post-death mortality report following prisoner death at a California county jail); Virmani v. Novant Health Inc., 259 F.3d 284, 292 (4th Cir. 2001) (refusing to recognize medical review privilege where allegations of discrimination arose from conduct of peer review officials); Memorial Hosp. for McHenry County v. Shadur, 664 F.2d 1058, 1063 (7th Cir. 1981) (denying medical review privilege in federal antitrust action).  Furthermore, nearly every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of privilege.  See, e.g., Lewis v. County of Henry, 2006 WL 1843336, at *2 (S.D. Ind. June 29, 2006) (rejecting medical peer review privilege in section 1983 medical malpractice claim arising out of detention at Clark County Nevada's Detention Center); Weiss v. County of Chester, 231 F.R.D. 202, 207 (E.D. Pa. 2005); Leon v. County of San Diego, 202 F.R.D. 631, 637 (S.D. Ca. 2001) (rejecting peer review privilege in the context of prisoner death litigation under section 1983); but see Hadix v. Caruso, 2006 WL 2925270, at *2 (W.D. Mich. Oct. 6, 2006) (finding existence of medical peer review privilege in Eighth Amendment prisoner civil rights claim).

    As noted above, the Court may recognize a privilege where "reason and experience" compel it to do.  The question before the Court is, does a privilege

protecting communications and documents generated by medical peer review committees promote sufficiently important interests to outweigh the need for probative evidence?  Based on an application of the <u>Jaffee</u> factors, the answer to this question must be no.

First, is the privilege rooted in the imperative need for trust and confidence?  In the context of peer review, a better question is, does the possibility of disclosure in litigation uniquely undermine medical peer review?  Most courts and commentators addressing the issue have merely assumed that the peer review privilege encourages peer review, and that the absence of the privilege undermines candor during the proceedings.  <u>See</u> <u>Eubanks v. Ferrier</u>, 245 Ga. 763, 766 (1980) (identifying purpose of peer review statutes and accepting the opinions of other courts that the statute represents a "proper legislative choice" between concerns for candor and access to evidence); <u>Hadix</u>, 2006 WL 2925270, at *1 ("The purpose of these laws is obvious on their face."); Lisa M. Njim, <u>Pitfalls of Peer Review: The Limited Protections of State and Federal Peer Review Law for Physicians</u>, 24 J. Legal Med. 541 (2003) ("[M]any physicians have been reluctant to serve on peer review committees due to the risk of involvement in related future litigation."); Kenneth R. Kohlberg, <u>The Medical Peer Review Privilege: A Linchpin for Patient Safety</u>, 86 Mass. L. Rev. 157, 161 (Spring

2002) ("The lack of federal recognition for peer review confidentiality . . . serves to discourage physicians from participating in peer review activities.").

The Court is not certain that the peer review privilege, and a total embargo upon the reports that are produced during such meetings, is essential to the peer review process. See Susan O. Scheutzow, State Medical Peer Review: High Cost But No Benefit - Is It Time for a Change?, 25 Am. J. L. & Med. 7, 8 (1999) ("[A]nalysis of data available from the National Practitioner Data Bank (NPDB), suggests that peer review protection statutes do not encourage peer review."). The answer to the question turns on what the purpose of the privilege is. If the purpose is to encourage more peer review, the answer is simple. There is little data to suggest that states with more robust privilege statutes have more peer review. Id. at 49. Indeed, it is difficult to believe that the DeKalb County Jail would simply cease efforts to determine why an inmate died in its facilities in the absence of a federal privilege. Peer review gives the jail an opportunity to identify the source of the problem so that it may avoid future litigation on the issue. Such reports may also help it to more appropriately serve the needs of its inmates, and to identify whether the problem was caused by an incompetent official that should be discharged.

On the other hand, one might argue that even though the privilege does not necessarily encourage peer review, or address any one of a number of reasons that

doctors or hospitals do not engage in peer review, when peer review does take place, the privilege encourages candor, which is essential to the quality of that review. The Court is not aware of any studies supporting this claim. Id. ("Although peer review communications originate in confidence, it is not possible to say that the element of nondisclosure is essential to the peer review process."). Physicians have an incentive to identify bad practices or to call out poor physicians. Oftentimes, one bad doctor can draw an entire medical team into a lawsuit, or undermine the reputation of a medical care facility. Doctors have an incentive to identify such bad doctors. There may be a need for some confidentiality, or even legal immunity for the participants, but that is a far cry from the need for an absolute embargo upon peer review information. See Nilavar v. Mercy Health System-Western Ohio, 210 F.R.D. 597, 608 (S.D. Ohio 2002) ("Defendants have not convinced this Court that the need for confidentiality in the peer review process . . . rises to the highest level of importance as it does in those other contexts [where there is a federal privilege], or that the process will not function properly in the absence of a federal evidentiary privilege.").

There are unique considerations at play in a post-death investigation ordered by a county jail that dramatically weaken the case for recognizing the privilege. A review of a deceased inmate is not the straightforward evaluation of medical care that occurs in the civilian context. The generation of post-death reports, including the one at issue

in this case, may include details such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored a situation more closely.  The report may verify the fact that a jail official failed to notify medical personnel.  Not only is this type of information "non-medical," but it is also may shed light, or at least raise an inference, of jail customs or policies.

It is true that one district court, however, has held that a peer review privilege should exist for medical peer review in prisons.  In Hadix v. Caruso, 2006 WL 2925270, at *2 (W.D. Mich. Oct. 6, 2006), the court drew upon dicta from a gigantic footnote in United States v. Michigan, 940 F.2d 143, 161-166 & n.12 (6th Cir. 1991), as support for the notion that a federal medical peer review privilege may block discovery in the context of Eighth Amendment litigation on behalf of a prisoner.  The court cited no precedent except for Bredice v. Doctors Hospital, Inc., 50 F.R.D. 249, 25-51 (D.D.C. 1970), a thirty-seven year old district court case that recognized a federal medical review privilege.  Bredice[4] itself cited only a single source of authority.

---

[4]Although the Hadix court is correct that Bredice was affirmed by the Court of Appeals, the claim is misleading.  The court only affirmed in an unreported, one word opinion ("AFFIRMED").  Further, Bredice also based its holding on the claim that "good cause" had not been shown for production.  Thus, it is unclear which aspect of the district court's holding was affirmed.  Additionally, Bredice was decided before the passage of Federal Rule of Evidence 501.

Id. ("The public interest may be a reason for not permitting inquiry into particular matters by discovery.") (quoting 4 Moore's Federal Practice, ¶ 26.22(2)). Hadix, however, is the only case to defend and recognize a medical peer review privilege in the context of prison litigation.  The court argued that an evaluation of the prisoner's medical records was enough to satisfy the prisoner's discovery requests, and that discovery of peer review meetings was unnecessary.  Given the extreme difficulty prison inmates often face in obtaining evidence of jail customs or policies, it is unlikely that access to a prisoner's medical records is enough.  See Lewis, 2006 WL 1843336, at *2 ("To restrict a civil rights plaintiff's access to the type of evidence would seriously inhibit such plaintiff's ability to prosecute these types of important federal claims.").  Access to peer review information is even more important in a case such as this where the Plaintiffs are alleging that jail officials disobeyed a state court order demanding that Jenkins be taken to a mental health facility.  Jails are not mental health facilities, and cannot be a substitute for one.  If there is evidence that the DeKalb County officials acted improperly, the information should see the light of the day.  Furthermore, Jenkins is not merely alleging medical malpractice, he is arguing that jail officials intentionally retaliated against him by forcing him to suffer a gruesome death at the hands of another inmate.  To the extent that Hadix has any persuasive value, it

disappears in the context of a section 1983 claim involving more than mere malpractice.

It is true that nearly every state has some form of a medical peer review statute, and that the <u>Jaffee</u> Court treated this as evidence that both "reason and experience" compelled a psychotherapist-patient privilege.   The policies of the states are not enough to warrant federal recognition of the privilege here.  First of all, there are wide disparities in the ways that each state crafts its medical peer review privilege.  <u>See</u> Susan O. Scheutzow & Sylvia Lynn Gillis, <u>Confidentiality and Privilege of Peer Review Information: More Imagined Than Real</u>, 7 J.L. & Health 169, 188 (1992-1993) ("Despite almost universal mention of peer review privilege, there is extremely wide variation in the privilege granted by the states."); <u>Trinity Med. Ctr., Inc. v. Holum</u>, 544 N.W.2d 148, 153 (N.D. 1996) ("[A]lthough nearly every state has some form of statutory privilege for medical peer review, it appears that no two statutes, or courts' interpretations of them, are alike.").  Even if some form of the privilege is recognized, this does not mean that there is unanimity on the question of whether the privilege should apply in the unique context of post-death investigations of a jail.  In either event, while the policies of the 50 states bears on the wisdom of a particular privilege, an inquiry under Federal Rule of Evidence 501 is not a privilege popularity contest.

That a particular lobby has been influential at the state level is not necessarily evidence that the privilege should be recognized in federal court.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Plaintiffs' Motion to Compel [Doc. 83] is GRANTED.  Dr. Brickhouse is ordered to comply with the Plaintiffs' subpoena, and to produce all relevant documents as outlined by the Plaintiffs' request.

SO ORDERED, this 12 day of March, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge