IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GREGORY L. JENKINS
Individually and as administrator of
the estate of Hoyt D. Jenkins,
deceased, et al.,

    Plaintiffs,

      v.

DEKALB COUNTY, GEORGIA,  et
al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:06-CV-1584-TWT

## OPINION AND ORDER

    This is a 42 U.S.C. § 1983 action that arises out of the murder of a DeKalb

County Jail inmate.  It is before the Court on the Defendants' Motion for Summary

Judgment [Doc. 115].  For the reasons stated below, the motion is GRANTED.

## I. Background[1]

Hoyt Jenkins was a 71 year old inmate locked up in the DeKalb County Jail. Jenkins suffered from multiple mental illnesses including schizophrenia and dementia. According to the Plaintiffs, Jenkins's illness manifested itself in the form of delusions, paranoia, bizarre thoughts and behavior, physical violence, and verbal outbursts. These outbursts often included racial epithets (Moses Dep. at 59) (it was "well known" that Jenkins used inflammatory racial slurs).  The Plaintiffs argue that Jenkins's mental illness was brought to the attention of DeKalb County as early as December 2003.  At that time, Superior Court Judge Robert Castellani ordered a psychiatric evaluation to determine whether Jenkins was competent to stand trial.  The psychiatrists found Jenkins to be delusional and actively psychotic.  On March 3, 2004, Judge Castellani ordered the Sheriff of DeKalb County to transfer Jenkins to the Georgia Regional Hospital in Atlanta.  The Sheriff's Department kept Jenkins in the

---

[1]At this stage of the litigation, the Court is required to view the facts and draw all reasonable inferences "in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  When conflicts arise between the facts presented by the parties, courts must credit the nonmoving party's version.  Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  Although the facts as accepted at the summary judgment stage of the proceedings may not be the "actual" facts of the case, the Court "must begin with a description of the facts in the light most favorable to the plaintiff."  Id. (citing Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002)).

DeKalb County Jail for the next three months. There is no evidence of any effort to comply with the state court order.

For reasons which are still unclear, Jenkins, an elderly, white, frail, one hundred forty-eight pound schizophrenic, was placed in a cell with Jason Smith, a young, black, six-foot tall, muscular inmate. Both inmates displayed evidence of physical aggression and mental instability. For example, Officer Dameco Moses indicated that Jenkins was known to initiate confrontations with other inmates by pulling them off the bed while they slept. (Moses Dep. at 59-60.) Corporal Monyette McLaurin testified that "one of the rules" was "don't put nobody with Mr. Jenkins" because of his aggressive and odd behavior. (McLaurin Dep. at 24.) Jenkins was frequently involved in altercations with jail officials and inmates. (Tadesse Decl. ¶ 6.) Furthermore, Officer Shane Gill testified that he was aware that Jenkins "liked to use the n-word a little bit," and that as a result, other guards "did not let him out with other people much because of that." (Gill Dep. at 92.)

There is evidence that Smith was unstable and violent, and that jail officials were aware of this. Smith was arrested on July 5, 2004, at a Hardee's restaurant in Decatur after he placed a "threat call" to the police. Officers arrived and found him sweating profusely. Smith immediately demanded that the officers take him to jail because he thought people were trying to kill him. When the officers asked him why they should

take him to jail, Smith voluntarily produced a bag of marijuana.  (Pls.' Statement of

Material Facts, App. A, Ex. 17.)  Within four hours of his arrest he was involved in an

unprovoked assault on a fellow inmate.   (Gojlewicz Decl. ¶ 4.)   In deposition

testimony, one officer indicated that Smith could be described as "assaultive and

violent."  (Long Dep. at 23.)  The next morning, Smith tried to escape from the

"intake" area and had to be wrestled to the ground by correctional officers.  Because

of this incident, the screening nurse made the decision to assign Smith to housing pod

3SW where special needs inmates were housed.

Jenkins was assigned to cell 604 in pod 3SW.  Smith was given a wristband

indicating that he was assigned to cell 605 in pod 3SW.  But when he was escorted to

pod 3SW, he was placed in cell 604 with Jenkins.  It is unclear how or why Smith and

Jenkins were placed in the same cell.  It is possible that Officer Shane Gill assigned

Smith to Jenkins's cell.  (Pls.' Resp. to Defs.' Mot. for Summ. J., at 24).  Indeed, two

days after the incident, in a written statement to the Office of Professional Conduct,

Officer Gill indicated that he "placed" Smith in cell 604.  (Pls.' Resp. to Defs.' Mot.

for Summ. J., at 24).  But in his deposition, Officer Gill is confused as to whether he

intended for Smith to be placed in cell 604, or whether he was merely stating that

Smith ended up being placed in cell 604.  (Pls.' Resp. to Defs.' Mot. for Summ. J., at

24; Gill Dep. at 171-72.)  It is unclear from Officer Gill's written statement whether

he meant to place Smith in 604 or 605.  (Pls.' Statement of Material Facts, App. A, Ex. 21).  If Officer Gill assigned Smith to Jenkins's cell, the Plaintiffs contend that it was done with reckless disregard of a substantial risk of harm.

If one believes that Officer Gill actually assigned Smith to 605, then there is another muddled version of events.  In this version, Smith was assigned to cell 605, but for some reason, either Officer Forrest Townsend or Officer Valdis Culver changed Smith's cell assignment to 604.  Officer Townsend was the security officer in charge of escorting Smith to the appropriate floor.  He had worked in the jail for six years and was aware of Jenkins's racist outbursts.  (Pls.' Resp. to Defs.' Mot. for Summ. J., at 25).  The Plaintiffs contend that he was aware of Smith's violent tendencies because he was also directly involved in subduing Smith during his escape attempt.  In his deposition testimony, Officer Townsend claims that Smith had "605" written on his armband, indicating that he was to be placed in that particular cell.  (Townsend Dep. at 53.)  Officer Townsend's only role, according to him, was to transport Smith to the appropriate floor - not to direct Smith to a particular cell. (Pls.' Resp. to Defs.' Mot. for Summ. J., at 25.)  He claims to have no idea how Smith ended up in Jenkins's cell. (Townsend Dep. at 53.)  Officer Culver's testimony, however, conflicts with Officer Townsend's.  Officer Culver contends that it was Officer Townsend who ordered Smith to be placed in cell 604.  (Culver Dep. at 68) ("I asked D.O. Townsend what pod

and room the inmate was to go in.  And D.O. Townsend said 604.").  Officer Culver was a security officer in Jenkins's wing of the prison.  He was also the individual who physically opened up cell 604.  He claims that it was Officer Townsend who told him to place Smith in cell 604.  (Culver Dep. at 68.)  In either event, the Plaintiffs contend that Officer Culver and Officer Townsend recklessly disregarded a substantial risk that Smith would harm Jenkins.

In their Complaint, the Plaintiffs alleged that "the Defendants deliberately placed inmate/detainee Smith in a locked cell with Jerkins to retaliate against Jenkins, a psychologically imbalanced inmate whose verbal and racial outbursts they were sick of." (Compl. ¶ 26).  They have produced no evidence of racially motivated retaliation.  In any event, this claim has been abandoned by failing to include it with citations to the record in the Plaintiffs' Statement of Material Facts.  A brief reference to the claim in their Response to the Defendants' Motion for Summary Judgment has no citations to the record.  (Pls.' Resp. to Defs.' Mot. for Summ. J., at 28).  The Plaintiffs point to no evidence that Officers Gill, Culver and Townsend were ever the subject of Jenkins's racial epithets.

At about 4:00 a.m. on July 7, 2004, DeKalb County jailers found Jenkins dead in cell 604.  The evidence suggests that Jenkins was "stomped" to death by Jason Smith.  He was found lying on his back, with his hands held near his face.  Gruesome

photographs reveal the extent of the injuries.  (Pls.' Statement of Material Facts, App. A, Ex. 39.) According to the autopsy, he suffered massive injuries to his head, neck, chest, and abdomen.  (Pls.' Statement of Material Facts, App. A, Ex. 4.) Jenkins suffered twenty-two broken ribs, punctured lungs, and his eyes were swollen shut.  The parties agree that the evidence shows that Smith savagely beat Jenkins to death.

Sheriff Thomas E. Brown is the official jailer of DeKalb County and is responsible for the "health, safety, and welfare of all inmates."  (Brown Dep. at 138-139); (Pls.' Statement of Material Facts, App. A, Ex. 1.)  He denied knowing anything about the incident until after it occurred.  Furthermore, he testified that he knew nothing about Judge Castellani's March 3, 2004 Order transferring Jenkins from jail to a mental health facility.  (Brown Dep. at 68.)  Although the Sheriff testified that it was incumbent upon Georgia Regional Hospital to contact the jail, and not the jail's obligation to attempt to transfer Jenkins, he testified that he did not know who was responsible for communicating with Georgia Regional or for facilitating such a transfer, but believes that the chief jailer might be. (Brown Dep. at 68) ("I don't know the answer to that question.  I suspect someone within the jail. And the person to ask would be the chief jailer . . .").

The Plaintiffs are the surviving children of Hoyt Jenkins.  They filed this lawsuit on July 3, 2006, against DeKalb County, Sheriff Thomas E. Brown in his individual

and official capacities, and Officers Gill, Culver, and Townsend. The Plaintiffs have alleged violations of the Eighth and Fourteenth Amendments, and have brought suit under 42 U.S.C. § 1983.

## II.  Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

Before delving into the disputed matters, the Court will quickly resolve the issues that the Plaintiffs have conceded in their Response [Doc. 139]. First, the claims against Sheriff Brown in his official capacity are dismissed. Second, the claims against

DeKalb County are also dismissed.  Third, all of the Plaintiffs' state law claims are dismissed.

A. Sheriff Brown

The Plaintiffs argue that Sheriff Brown is liable for the harm caused by placing Smith in Jenkins's cell.  It is undisputed that Sheriff Brown did not personally participate in any of the events leading up to Jenkins's death.  The parties also agree that Sheriff Brown is ultimately responsible for the training of officers with regards to inmate assignment, handling, placement, and classification.  The issue, for supervisory liability purposes, is whether there is a causal connection between Sheriff Brown's conduct and the infliction of a constitutional injury.

At the outset, it is worth noting that the Plaintiffs have styled their claim against Sheriff Brown as a "supervisory liability" claim.  (Pls.' Resp. to Defs.' Mot. for. Summ. J., at 3)  A supervisory liability claim, though a claim against a person in his individual capacity, is different from a traditional individual liability claim.  The premise of a supervisory liability claim is that a supervisor's subordinate has inflicted a constitutional violation, but the supervisor either personally participated in the injury or there is an affirmative "causal link" between the supervisor's conduct and the subordinate's infliction of the constitutional injury.  See Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007); see also Kit Kinports, *Supervisory Liability in Section*

*1983 Cases*, 15 Touro L. Rev. 1657 (1999).  A causal connection may be established when: (1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully and failed to stop them from doing so.  Mathews, 480 F.3d at 1270.  The Eleventh Circuit has warned, however, that liability must be based on more than respondeat superior.  See Braddy v. Florida Dep't of Labor and Employment Security, 133 F.3d 797, 801 (11th Cir. 1998).

The Plaintiffs have produced no evidence that Sheriff Brown was on notice that his officers engaged in a widespread practice of housing vulnerable inmates with violent and assaultive inmates.  Therefore, the usual basis for imposing liability upon a supervisor is nonexistent here.  So, the Plaintiffs argue that Sheriff Brown is liable as a supervisor for failing to adequately train and supervise officers with respect to inmate housing assignments.  They rely upon Policy Order J2-1 which states that "[i]nmates will not be placed in a cell other than that designated on the armband." (Pls.' Statement of Material Facts, Ex. 26, at 4.)  In reality, they argue, inmates often end up in cells other than those designated on their armband.  Officer Gill testified that "[i]nmates were not always located in the specific cells they were assigned to . . ." (Gill

Dep. at 26.)  In a sworn affidavit, an inmate noted that it was "common . . . for inmates to move from one cell to another without there being a formal change of cell assignment." (Weekley Decl. ¶ 24.)  Sheriff Brown admitted his knowledge that "there are problems from time to time with [inmates] losing and destroying their armbands." (Brown Dep. at 120.)  Officer Gill stated that "quite frequently" inmates could not be found in their assigned cells.  (Gill Dep. at 27-28.)  He also indicated that there is no policy in place that instructs guards to return inmates to their original cells once they are found to be in the wrong cell.  (Gill Dep. at 29.)  Jail officials are only supposed to "audit" the cells once every six months to ensure that the physical count on the floor matches the assignments on the computer.  (Gill Dep. at 59.)

Section 1983 is not a general tort liability statute.  It provides a remedy for violations of constitutional or federal rights.  In order to impose supervisory liability, the official must be aware of subordinate conduct that is likely to lead to constitutional violations.  See, e.g., Greason v. Kemp, 891 F.2d 829, 837 n.18 (1990); Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985) ("The required causal connection can also be established when a history of abuse by subordinates has put the supervisor on notice of the need for improved supervision and training, and his failure to take corrective action sets the stage for the inmate's injury.").  Putting the wrong inmate in Jenkins's cell was not a violation of his constitutional rights even if it was

a violation of internal Sheriff's Department policy.  The Plaintiffs have not pointed to any evidence that the purpose of Policy Order J2-1 is primarily to maintain inmate safety as opposed to simply keeping track of where inmates are in the jail.  The Plaintiffs have not pointed to any evidence of widespread inmate-on-inmate violence because inmates were in the wrong cells.  The inmates in pod 3SW were not kept in 24 hour lock down.  Therefore, a violent encounter between Smith and Jenkins could have occurred notwithstanding their cell assignments.  Sheriff Brown is not subject to supervisory liability on this basis.

Next, the Plaintiffs argue that the prison guards did not react to the incident between Jenkins and Smith quickly enough.  This delay, they argue, is evidence of poor training and supervision.  The Plaintiffs claim that the facts "further demonstrate a breakdown in policy to such extent that accountability at the highest level is demanded."  (Pls.' Resp. to Defs.' Mot. for Summ. J., at 6.)  The Plaintiffs fail to present any evidence about deficiencies in the DeKalb County training program, or explain how superior training would have addressed this problem.  Their argument is, in essence, a request for respondeat superior liability, which as noted above, is impermissible.  To the extent that the Plaintiffs are arguing that Sheriff Brown's failure to supervise is causally related to Jenkins's death, they have failed to prove that specific deficiencies in training or supervision would have alleviated the problem.  See

Board of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 415 (1997) ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

Finally, the Plaintiffs contend that Sheriff Brown is liable for Jenkins's death because he disregarded Judge Castellani's court order requiring that Jenkins be transferred to Georgia Regional Hospital. Sheriff Brown testified that he had no knowledge of the transfer order.  In his deposition, he indicated that as a general matter, the policy of the jail is to wait until Georgia Regional contacted the jail before transferring an inmate.  (Brown Dep. at 68.)

The Sheriff's failure to comply with the transfer order is disturbing.  But there is no evidence that the purpose of the transfer order was to protect Jenkins from being assaulted by other inmates.  In all likelihood, the purpose of the transfer order was to get Jenkins treatment for his mental illness.  Whether Jenkins would have been or would not have been back at the jail in July 2004 after receiving treatment is entirely speculative.  The Plaintiffs' argument would be pertinent if this were a lawsuit by Jenkins for failure to provide mental health treatment.  That is not the claim made by the Plaintiffs.  The Plaintiffs are again confusing causation in fact with proximate causation.

B.  <u>Townsend, Gill, and Culver</u>

The Defendants Townsend, Gill, and Culver seek summary judgment on the grounds of qualified immunity.  The Defendants may be shielded from liability for civil damages if they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (<u>citing</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities.  <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007).

Once eligibility for qualified immunity is established, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.  <u>Mathews v. Crosby</u>, 80 F.3d 1265, 1269 (11th Cir. 2007).  This consists of a two-part inquiry, set forth in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001).  First, the Court asks, "do the facts alleged show the officer's conduct violated a constitutional right?"  <u>Id.</u> at 201.  If a constitutional violation is established, based on the facts in the light most favorable to the plaintiff, the Court then must determine whether such conduct would have violated federal law that was clearly established at the time of the incident.  <u>Mathews</u>, 480 F.3d at 1269; <u>Garrett v. Athens-Clarke County</u>, 378 F.3d 1274, 1278-79 (11th Cir. 2004).

The Plaintiffs contend that the Defendants are not entitled to qualified immunity because they were not exercising discretionary authority.  They argue that the Defendants had no discretion to put Jason Smith in any cell other than the one to which he was assigned.  This argument reflects a fundamental misunderstanding of the qualified immunity analysis.  A large metropolitan jail will have many rules, policies and procedures.  The fact that a correctional officer makes a mistake and violates a rule, policy or procedure does not mean that the officer is no longer acting within the scope of his duties as a correctional officer.  See, e.g., Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003) (guards watching video games rather than jail surveillance monitors).  The Defendants in this case were acting within the scope of their discretionary authority in assigning Smith and Jenkins to any cell, whether or not they made a mistake and put Smith in the "wrong" cell.  Therefore, they are eligible for qualified immunity.  The burden now shifts to the Plaintiffs to show that qualified immunity is not appropriate.  Mathews, 480 F.3d at 1269.

As set forth above, the first question is whether the Defendants' conduct violated Jenkins's constitutional rights.  Section 1983 provides a cause of action for persons whose rights under the federal constitution have been violated under color of state law. 42 U.S.C. § 1983.  The statute confers no substantive rights itself.  Rather, it provides "a method of vindicating federal rights elsewhere conferred."  Graham v. Connor, 490

U.S. 386, 393-94 (1989).  To establish a section 1983 violation, the plaintiff must show

(1) conduct committed by a person acting under color of state law (2) that deprived him

of rights, privileges, or immunities secured by the Constitution or laws of the United

States.  Parratt v. Taylor, 451 U.S. 527, 535 (1981).

The Eighth Amendment "requires that inmates be furnished with the basic

human needs, one of which is reasonable safety." Helling v. McKinney, 509 U.S. 25,

33 (1993).  Therefore, a prison official may be liable under the Eighth Amendment

when "the official knows of and disregards an excessive risk to inmate safety." Farmer

v. Brennan, 511 U.S. 825, 837 (1994).

There are two parts of the Eleventh Circuit's interpretation of Farmer.  First,

there is an objective component.  The plaintiff must demonstrate that he suffered an

"objectively, sufficiently serious" injury.  Boxer X v. Harris, 437 F.3d 1107, 1111

(11th Cir. 2006).  "[T]he condition must have inflicted unnecessary pain or suffering

upon the prisoner." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993).  "This

objective standard embodies broad and idealistic concepts of dignity, civilized

standards, humanity, and decency . . . but must also be balanced against competing

penological goals." Id.  In this case, the Plaintiffs have shown an objectively serious

injury.  The murder of Jenkins served no legitimate penological objective.  Therefore,

this component of liability has been met.

The second component is subjective.  It requires the plaintiff to show facts which allow a reasonable trier of fact to infer that the prison official had a "sufficiently culpable state of mind."  Id.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  On a motion for summary judgment on an Eighth Amendment claim, the Eleventh Circuit interprets Farmer to require the production of "sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  Purcell v. Toombs Cnty., 400 F.3d 1313, 1319 (11th Cir. 2005).

Although the inquiry has been labeled as "objective," there is no formula for determining how substantial the risk of serious injury must be before triggering Eighth Amendment liability.  The reason for the absence of a precise formula stems in part from the fact that "no static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."  Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (citation omitted). Though "Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges," id. (quoting Rummel v. Estelle, 445 U.S. 263, 275 (1980)), most cases in the Eleventh Circuit regarding the "substantial risk of serious

injury" appear to be highly fact driven, and based upon an undefined threshold of "seriousness." See, e.g., Purcell, 400 F.3d at 1323 (holding that "conditions evidenced by the record here were not sufficiently grave to violate the Constitution"); Chandler v. Crosby, 379 F.3d 1278, 1298 (11th Cir. 2004) (holding that allegation of extreme summer heat in prison fail to meet the "high bar" of demonstrating a substantial risk of serious injury); Marsh v. Butler Cnty., 268 F.3d 1014, 1028 (11th Cir. 2001) ("We accept that conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates."); Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003) (finding that inmate with history of violent outbursts and mental instability represented an objectively substantial risk of serious harm to inmates). This is to be expected. "[T]he Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability of a given punishment." Rhodes, 452 U.S. at 346 (citations omitted). "But such judgments should be informed by objective factors to the maximum possible extent." Id. (citation and punctuation omitted). In none of these cases did the Eleventh Circuit identify a formula that district courts should resort to for the purposes of determining how "substantial" the risk of "serious harm" is.

As a general matter, there is a difficulty in weighing any risk. Risks do not come with labels on them, and there is some subjectivity in assessing how likely a particular risk is. There is always a general risk of harm in any prison, as there is a risk of harm in life. The issue here is whether placing Jenkins in a cell with Smith carried a "substantial" risk, or probability, of injury. See, e.g., James E. Krier and Clayton P. Gillette, Risk, Courts, and Agencies, 138 U. Penn. L. Rev. 1027, 1108 (1990) (defining risk as the probability of an event occurring); see also Frank H. Knight, Risk, Uncertainty, and Profit 19-20, 197-232 (1921) (distinguishing between "risk" - a mathematically measurable concept - and other circumstances of "uncertainty").

In hindsight, it is easy to say that there was a risk that Smith would harm Jenkins. Indeed, the tragic result was that Jenkins was savagely beaten to death by his cellmate. See Johnson v. California, 543 U.S. 499, 526-527 (2005) (Thomas, J., dissenting) ("[D]ouble cells are especially dangerous. The risk of racial violence in public areas of prison is high, and the tightly confined, private conditions of cells hazard even more violence . . . The risk of violence caused by this privacy is grave, for inmates are confined to their cells for much of the day."). The issue is whether the Defendants were aware of this very substantial risk of harm and disregarded it.

The Supreme Court held in Farmer that "an official's failure to alleviate a significant risk that he should have perceived but did not" is not a basis for Eighth

Amendment liability.  Farmer, 511 U.S. at 838.  But, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. at 842 (citations omitted); see also Hope v. Pelzer, 536 U.S. 730, 738 (2002) (quoting approvingly of Justice Souter's language in Farmer noting that "[w]e may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.").

It is the Plaintiffs' burden to point to facts that show that the Defendants are not entitled to qualified immunity.  They could do that by showing, for example, that the Defendants stood by and watched as Jenkins was beaten to death.  That would be a classic case of deliberate indifference.  Here, at best, the Plaintiffs have shown that the Defendants collectively were in possession of sufficient facts that they should have drawn the inference that putting Smith in the cell with Jenkins posed a substantial risk of serious injury to Jenkins.  In other words, a case can be made that collectively they were negligent.  This is not an appropriate basis for imposing Eighth Amendment liability.  Farmer, 511 U. S. at 838 ("But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").  There is no

evidence that any of the individual Defendants subjectively believed that such a risk

existed.  Therefore, they are entitled to qualified immunity.

## IV. <u>Conclusion</u>

For the reasons stated above, the Defendants' Motion for Summary Judgment

[Doc. 115] is GRANTED.

SO ORDERED, this 15 day of November, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge